UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____x
KEITH HARVEY

Petitioner

-against-

LETITIA JAMES in her Official Capacity                    Civil No.:
As THE ATTORNEY GENERAL OF THE
STATE OF NEW YORK;

MELINDA KATZ in her Official Capacity
As THE QUEENS COUNTY DISTRICT ATTORNEY


Defendants
_____x


1.      KEITH HARVEY (hereinafter "Harvey") by and through counsel of record, bring this

complaint against Defendants, New York officials responsible for enforcing a state law infringing

the Second Amendment right of KEITH HARVEY to possess the rifles for which he is being

prosecuted by the State of New York by and through MELINDA KATZ as the Queens County

District Attorney under Indictment Number 2391/2018 and allege as follows:


INTRODUCTION

2.      The Second Amendment to the United States Constitution guarantees "the right of the

People to keep and bear Arms." U.S. CONST. amend. II. Under this constitutional provision,

Plaintiff Harvey has a fundamental, constitutionally guaranteed right to keep common firearms for defense of self and family and for other lawful pursuits.

3.    New York State has enacted and the defendants have enforced a flat prohibition on the possession, manufacture, transport, or disposal of many common semiautomatic firearms — in appropriately labeled "assault weapons"—by ordinary citizens, making it criminal for law-abiding, peaceable citizens to exercise their fundamental right to keep and bear such arms. N.Y. PENAL LAW §§ 265.00(22), 265.02(7), 265.10.

4.    New York State, through the Defendant Melinda Katz the Queens County District Attorney indicted Harvey under Indictment Number 2391/2018 for the possession of four (4) semi-automatic rifles that under the Penal Law Section 265.02(7) also known as the SAFE ACT and are considered "Assault Weapons" and per se illegal to possess even in one's  home. Indictment 2391/2018 is attached hereto as **Exhibit A**. Harvey was indicted by the Queens County District Attorney on or about October 29, 2018 by a Grand Jury on the following counts:

> *Criminal Possession of a Weapon in the Second Degree (P.L. Section 265.03 1B) under Counts 1, 3, 5, 7.*
>
> *Criminal Possession of a Weapon in the Third Degree (P.L. Section 265.02(7)  under Counts 2, 4, 6, 8.*
>
> *Criminal Possession of a Weapon in the Third Degree (P.L. Section 265.02-5I) under Count 9;*
>
> *Criminal Possession of a Weapon in the Fourth Degree (P.L. Section 265.01-1) under Count 10.*

5.     Defendants' enforcement of New York's ban denied Harvey his fundamental, individual right to keep and bear semi-automatic rifles that are in common use and commonly used for lawful purposes.  The following rifles were seized in Harvey's case and are named in the aforementioned indictment as "assault weapons" that violate Penal Law Section 265.07(2):

     1.     Romarm Model GP/WASR Semi automatic Rifle with pistol grip;

     2.     Czech Small Arms Model SA VZ semi automatic Rifle with a telescoping stock;

     3.     Fabrique Nationale semi-automatic Rifle Model PS90 with thumbhole Stock,  second handgrip and flash suppressor;

     4.     POF Model P 308 semi automatic rifle with a bayonet mount.

6.     The Second Circuit previously upheld the laws at issue against a Second Amendment challenge. *New York State Rifle and Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 243 (2d. Cir. 2015). The recent Supreme Court case *New York State Rifle and Pistol Association v. Bruen*, however, abrogated that decision and no governing caselaw forecloses Plaintiffs' claims. 597 U.S. ---, 142 S. Ct. 2111 (2022).

## JURISDICTION & VENUE

7.     This Court has subject-matter jurisdiction over all claims for relief pursuant to 28 U.S.C. §§ 1331 and 1343.  Plaintiffs seek remedies under 28 U.S.C. §§ 1651, 2201, and 2202 and 42 U.S.C. §§ 1983 and 1988. Venue lies in this Court under 28 U.S.C. § 1391(b)(1) and (b)(2).

**PARTIES**

8.      Plaintiff Keith Harvey is a natural person, a resident of Queens County, New York, an adult over the age of 21, a citizen of the United States, and legally eligible under federal and state law to possess and acquire firearms.

9.      Defendant Letitia James is the Attorney General of New York. As Attorney General, she exercises, delegates, or supervises all the powers and duties of the New York Department of Law, which is responsible for executing and enforcing New York's laws and regulations governing the possession of firearms. Her official address is Office of the Attorney General, The Capitol, Albany, NY 12224-0341. She is being sued in her official capacity.

10.     Defendant Melinda Katz is the District Attorney for Queens County. As District Attorney, "Katz" is the prosecutorial officer with the responsibility to conduct all prosecutions for crimes and offenses cognizable by the courts of the county in which [she] serves." *People v. Di Falco,* 44 N.Y.2d 482, 487, 377 N.E.2d 732, 735 (1978). Her official address is Queens County District Attorney, 125-01 Queens Boulevard, Kew Gardens, New York. She is being sued in her official capacity. The Queens County District Attorney is the entity prosecuting Plaintiff Harvey.

11.     Plaintiffs who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Art. III of the Constitution by alleging an actual case or controversy. *Flast v. Cohen,* 392 U. S. 83, 94-101(1968); *Jenkins v. McKeithen* 395 U. S. 411, 421-425 (1969) (opinion of MARSHALL, J.). Plaintiffs must demonstrate a "personal stake in the outcome" in order to "assure that concrete adverseness which sharpens the

presentation of issues" necessary for the proper resolution of constitutional

questions. *Baker v. Carr,* 369 U. S. 186, 204 (1962). Abstract injury is not enough. The plaintiff

must show that he "has sustained or is immediately in danger of sustaining some direct injury" as

the result of the challenged official conduct and the injury or threat of injury must be both "real

and immediate," not "conjectural" or "hypothetical." See, e. g., *Golden v. Zwickler*, 394 U. S.

103, 109-110 (1969); *Public Workers v. Mitchell,* 330 U. S. 75, 89-91 (1947); M*aryland Casualty

Co. v. Pacific Coal & Oil Co.*, 312 U. S. 270, 273 (1941); *Massachusetts v. Mellon*, 262 U. S.

447, 488 (1923).

12.    The Plaintiff in this case indisputably has met this threshold requirement and has

a personal stake in the outcome.  Despite the *Bruen* holding, which clearly makes the SAFE ACT

and Penal Law Section 265.02(7) and 265.00(22) unconstitutional, the Queens County District

Attorney has opposed Harvey's motion to dismiss the indictment and continues to zealously to

prosecute Harvey for possession of the aforementioned four semi-automatic rifles. If the this

Court does not declare the SAFE ACT unconstitutional and/or enjoin Harvey's prosecution,

Harvey will face mandatory incarceration if convicted. If convicted, the trial judge has the

discretion to sentence Harvey to consecutive sentences of  incarceration on each of the four (4)

rifles. If this occurs, Harvey at minimum could serve eight (8)  years incarceration and a

maximum of  more than sixty (60) years in prison. This is a unique and extraordinary set of

circumstances where the harm to Harvey will be draconian and irreparable.  One could not think

of more extraordinary and exigent circumstances than the prospect of spending years if not

decades in prison on the basis of a statute that has been rendered patently unconstitutional in

New*York State Rifle and Pistol Association v. Bruen surpa.*

## **FACTUAL ALLEGATIONS**

13.     On April 25, 2018, a search warrant was executed at the Queens County New York home of Keith Harvey by the NYPD.  Harvey at the time was a 45 year old man, with no criminal record and gainfully employed as a carpenter which has been his profession for over 25 years.  Harvey owned the private home that was searched by the NYPD.

14.     Inside Harvey's home, the police recovered thirteen rifles and ammunition.  Some of the rifles were stored in a locked safe and most of the rifles were stored in a storage space in his bedroom on a gun rack without magazines inserted in the rifles. The ammunition for the rifles was stored separately in the house and most of the ammunition was stored in the closed containers and packaging of the retail stores where the ammunition was purchased.

15.     Four (4) of the thirteen (13) rifles recovered in Mr. Harvey's home were considered "assault weapons" pursuant to 265.02(7) because the rifles were semi-automatic rifles with at least one illegal feature listed in the statute.

16.     The Queens County felony case has been litigated for four years in Supreme Court of the State of New York Criminal Term, County of Queens. On or about August 22, 2022, Mr. Harvey filed a motion to dismiss the indictment based upon the United States Supreme Court decision in *New York State Rifle and Pistol Association v. Bruen*, *supra*. The Queens County District Attorney opposed the motion. (See **Exhibit B)**. On November 22, 2022, the Queens County Supreme Court Judge Peter F. Vallone denied Harvey's motion to dismiss. (See **Exhibit C**).

17.     Accordingly, Mr. Harvey has exhausted all of his remedies in state court to enjoin

the prosecution by the Queens County District Attorney and now seeks Federal intervention to

address the his prosecution of Harvey based upon a penal statute that is now unconstitutional

under *New York State Rifle and Pistol Association v. Bruen supra.*

## THE SAFE ACT IS NOW UNCONSTITUTIONAL

18.     New York applies the inaccurate label of "assault weapon"[1] to many

semiautomatic[2] firearms in common use, commonly used for lawful purposes and criminalizes

their possession ("SAFE ACT"). N.Y. PENAL LAW §§ 265.00(22)(a)-(f); 265.02(7), 265.10,

70.02.

19.     Specifically, New York defines "assault weapon" as;

(a) a semiautomatic rifle that has an ability to accept a detachable magazine and has at

least one of the following characteristics:

(i) a folding or telescoping stock;
(ii) a pistol grip that protrudes conspicuously beneath the action of the weapon;
(iii) a thumbhole stock;
(iv) a second handgrip or a protruding grip that can be held by the non-trigger hand;
(v) a bayonet mount;
(vi) a flash suppressor, muzzle break, muzzle compensator, or threaded barrel designed to accommodate a flash suppressor, muzzle break, or muzzle compensator;
(vii) a grenade launcher; or

(b) a semi-automatic shotgun that has at least one of the following characteristics:

(i)a folding or telescoping stock;
(ii) a thumbhole stock;

---

[1]N.Y. PENAL LAW § 265.00(22).

[2]Semiautomatic" means "any repeating rifle, shotgun or pistol, regardless of barrel or overall length, which utilizes a portion of the energy of a firing cartridge or shell to extract the fired cartridge case or spent shell and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge or shell." N.Y. PENAL LAW § 265.00(21). See also *Staples v. United States*, 511 U.S. at 602

(iii) a second handgrip or a protruding grip that can be held by the non-trigger hand;
(iv) a fixed magazine capacity in excess of seven rounds;
(v) an ability to accept a detachable magazine; or

(c) a semi-automatic pistol that has an ability to accept a detachable magazine and has at
least one of the following characteristics:

(i) a folding or telescoping stock;
(ii) a thumbhole stock;

(iii) a second handgrip or a protruding grip that can be held by the non-trigger hand;
(iv) capacity to accept an ammunition magazine that attaches to the pistol outside
of the pistol grip;

(v) a threaded barrel capable of accepting a barrel extender, flash suppressor, forward
handgrip, or silencer;
(vi) a shroud that is attached to, or partially or completely encircles, the barrel and that
permits the shooter to hold the firearm with the non-trigger hand without being burned;
(vii) a manufactured weight of fifty ounces or more when the pistol is unloaded, or;
(viii) a semi-automatic version of an automatic rifle, shotgun, or firearm;

(d) a revolving cylinder shotgun;

(e) a semiautomatic rifle, a semiautomatic shotgun or a semiautomatic pistol or weapon
defined by [New York Penal Law § 265.00(22)(e)(v) as that section read under] the laws
of [2000 and otherwise lawfully possessed] prior to September [14, 1994]; or

(f) a semiautomatic rifle, a semiautomatic shotgun or a semiautomatic pistol or weapon
defined [above] in [sub]paragraph (a), (b), or (c) [and] possessed prior to [January 15,
2013]. N.Y. PENAL LAW § 265.00(22)(a)-(f).

20.    New York categorically prohibits possession of all such firearms. *New York State
Rifle and Pistol Ass'n, Inc. v. Cuomo,* 804 F.3d 242 (2015). Violation of New York's SAFE ACT
is a Class D felony punishable by up to seven years in prison and a fine between $2,000 and
$10,000. N.Y. PENAL LAW §§ 265.02(7), 265.10, 70.02.

21.    In the Supreme Court criminal case, the Queens County District Attorney's
current offer to Plaintiff Harvey is that he plead guilty to a violent felony offense and serve four

(4) years in state prison with a term of post release supervision.  As mentioned earlier herein, if Harvey is convicted at trial, he is facing decades in prison for possession of the four "assault weapons" which when seized by police were being stored safely and securely in his home. Presently, Harvey's case is in the Gun Trial Assignment Part in Queens Supreme Court and the cases in on the trial calendar. All pre-trial hearings have been completed. It would be the height of injustice if Harvey is convicted and sentenced to state prison and must wait years while incarcerated for a State Appellate Court or Federal Court to decide the SAFE ACT is unconstitutional.

## NEW YORK BAN ON RIFLES IN COMMON USE IS UNCONSTITUTIONAL

22.     Semiautomatic firearms "traditionally have been widely accepted as lawful possessions," e.g., *Staples v. United State*s, 511 U.S. 600, 612 (1994) (so categorizing an AR-15 semiautomatic rifle), and the Second Circuit has previously held that "[e]ven accepting the most conservative estimates" firearms banned by New York law "are 'in common use' as that term was used in Heller." *Cuomo*, 804 F.3d at 255.

23.     Rifles built on an "AR-style" platform are a paradigmatic example of the type of arm New York bans ("AR" is short for ArmaLite Rifle (not Assault Rifle) ; ArmaLite originally designed the platform).

24.     AR-15 rifles are among the most popular firearms in the nation, and they are owned by millions of Americans for lawful purposes like sport shooting, home defense and hunting.

25.     In *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017), abrogated by *Bruen, supra*, the

Court upheld a challenge to the Colorado law banning possession of assault weapons.  In his

dissent (which, after Bruen, likely represents the correct interpretation of the law), Judge Traxler

stated:

> *It is beyond any reasonable dispute from the record before us that a statistically significant number of American citizens possess semiautomatic rifles (and magazines holding more than 10 rounds) for lawful purposes.  Between 1990 and 2012, more than 8 million AR- and AK- platform semiautomatic rifles alone were manufactured in or imported into the United States.  In 2012, semiautomatic sporting rifles accounted for twenty percent of all retail firearms sales.  In fact, in 2012, the number of AR- and AK- style weapons manufactured and imported into the United States was more than double the number of the most commonly sold vehicle in the U.S., the Ford F-150.  In terms of absolute numbers, these statistics lead to the unavoidable conclusion that popular semiautomatic rifles such as the AR-15 are commonly possessed by American citizens for lawful purposes within the meaning of Heller.*

26.     FBI Statistics clearly illustrate that AR-15 type sport rifles are not commonly used

to commit crime. According to a widely cited 2004 study, these arms "are used in a small

fraction of gun crimes." Indeed, according to FBI statistics in 2019 there were only 364

homicides known to be committed with rifles of any type, compared to 6,368 with handguns,

1,476 with knives or other cutting instruments, 600 with personal weapons (hands, feet, etc.) and

397 with blunt objects. Expanded Homicide Table 8, Crime in the United States (FBI 2019).

27.     There is no constitutionally relevant difference between a semiautomatic

handgun, shotgun, and rifle. While some exterior physical attributes may differ, they are, in all

relevant respects, the same.

28.     The statute's ban on acquiring, purchasing, receiving, transporting, possessing,

and lawfully using an "assault weapon" is, therefore, a ban on keeping and bearing

semiautomatic firearms that are commonly possessed and used for lawful purposes, including self-defense in the home.

## THE SAFE ACT UNDER *BRUEN* VIOLATES THE SECOND AMENDMENT

29.     Under the Second Amendment, "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II.

30.     In *District of Columbia v. Heller,* 554 U. S. 570, the Supreme Court announced that the Second Amendment codified an individual right to possess and carry weapons "in common use" by citizens for "lawful purposes like self-defense." *Heller*, 554 U.S. at 624. This right is at its "zenith within the home." see *Heller,* 554 U.S. at 628-29, 635.  "The Second Amendment . . . surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home.".

31.     In *District of Columbia v. Heller,* 554 U. S. 570, and *McDonald v. Chicago,* 561 U. S. 742, the Court held that the Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense. Under *Heller,* when the Second Amendment"s plain text covers an individual"s conduct, the Constitution presumptively protects that conduct, and to justify a firearm regulation the government must demonstrate that the regulation is consistent with the Nation"s historical tradition of firearm regulation.

32.     Since *Heller* and *McDonald*, the Courts of Appeals have developed a "two-step" framework for analyzing Second Amendment challenges that combines history with means-end scrutiny.

33.     The recent Supreme Court decision in the *New York Pistol and Rifle Association*

*v. Bruen, Superintendent of New York State Police et al, supra* rejected that two-part approach as having one step too many. The *Bruen* decision held that step one is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history.

34.     Importantly, the *Bruen* court held that *Heller* and *McDonald* do not support a second step that applies means-end scrutiny in the Second Amendment context. The *Bruen* decision clarified that *Heller*'s methodology centered on constitutional text and history and it did not invoke any means-end test such as strict or intermediate scrutiny, and it expressly rejected any interest-balancing inquiry akin to intermediate scrutiny.

35.     The Supreme Court held the following in the *Bruen* decision :

> *"In sum, the Courts of Appeals' second step is inconsistent with Heller's historical approach and its rejection of means and scrutiny. We reiterate that the standard for applying the Second Amendment is as follows: when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the nations historical tradition of firearm regulation. Only then can a court conclude that the individual's conduct falls outside the Second Amendment on qualified command."*

36.     The *Bruen* Court explained that the historical understanding of the Second Amendment must be analyzed <u>at the time of the Second Amendment and Fourteenth Amendment's enactment</u>. The Court specifically discounts the value of historical analysis of statutes that regulated the Second Amendment years, decades and centuries before or after the 1791 and 1868, the years of the enactments of the Second and Fourteenth Amendments.

37.     In the arguments supporting the *Bruen* case, the government pointed to "a variety of historical sources from the late 1200s to the early 1900s." The *Bruen* Court held that *"when it comes to interpreting the constitution, not all history is created equal. Constitutional rights are*

*enshrined with the scope they were understood to have when the people adopted them.* T*he*

*Second amendment was adopted in 1791; the Fourteenth in 1868. Historical evidence that long*

*predates or post dates either time may not illuminate the scope of the right." Heller,* 554 U.S. at

634–635.

### THERE IS SIMPLY NO HISTORICAL BASIS FOR THE SAFE ACT

38**.**     Under *Bruen*, the New York statute is unconstitutional.  There is simply no

historical statutory precedent that existed in the late 18th or 19th centuries that supports a total

prohibition of the possession of "assault weapons" as defined by the 265.00(22).

39.     In determining whether the SAFE ACT is constitutional under *Bruen*, the sole

question  is whether New York's prohibition of the possession of an "assault weapon" (even in

one's home) under the SAFE ACT is inconsistent with the Second Amendment's text and

historical understanding. *Bruen* holds that the burden is unequivocally on the Defendants to

prove that the SAFE ACT's prohibition of Assault Weapons is consistent with Second

Amendment's text and historical understanding.

40.     The Plaintiff contends that the SAFE ACT is inconsistent with the text and

historical understanding of the Second Amendment.  Upon information and belief, United States

history is devoid of any historical precedent for regulating rifles, especially rifles possessed

inside one's home. More specifically, there is no analogous historical precedent for the

regulation of the types of rifles prohibited by the SAFE ACT.

41.     Upon  review *NYRA v. Cuomo,* 804 F. 3d 242 (2014), the Second Circuit

 decision that upheld the constitutionality of the SAFE ACT. The

 Second Circuit in the *NYRA v. Cuomo* case followed the *Heller/McDonald* "two-step'

framework for analyzing Second Amendment challenges that combines history with means-end scrutiny. "Step one is a "test rooted in Second Amendment's text as informed by history." See *Heller* at 572. *Bruen* held that the second step-the means-end test is no longer necessary.

42.     In *NYRA v. Cuomo*, the Second Circuit conducted the first step of the two pronged framework and unequivocally found that under the first step analysis, (the text and history analysis) that the firearms prohibited by the SAFE ACT, namely AR-15's and other similar sporting rifles, were indeed firearms protected by the Second Amendment. When the Second Circuit Court applied a text and historical analysis of the SAFE ACT it held that the weapons. prohibited by the SAFE ACT [ Penal Law Section 265.00(22)] are in common use and typically possessed by law abiding citizens for lawful purposes. *NYRA v. Cuomo* stated "as an initial matter, then, we must determine whether the challenged legislation impinges upon conduct protected by the Second Amendment.

43.     The Second Amendment protects only "the sorts of weapons" that are (1) "in common use" and (2) "typically possessed by law-abiding citizens for lawful purposes.*"* When discussing weapons banned under the SAFE ACT the Second Circuit Court in *NYRA v. Cuomo* held that "[e]ven accepting the most conservative estimates cited by the parties and by amici, the assault weapons and large-capacity magazines at issue are "in common use" as that term was used in *Heller supra.* The D.C. Circuit reached the same conclusion in its well- reasoned decision in *Heller II,* which upheld the constitutionality of a District of Columbia gun- control act substantially similar to those

at issue here.*"*

*44.*      Moreover*,* the Second Circuit court concluded, citing the *Heller* decision,

that these rifles prohibited by the SAFE ACT were not only in common use, but were

typically possessed by law-abiding citizens for lawful purposes. The Second Circuit wrote

**"**These "commonly used weapons and magazines are also typically possessed by law-abiding

citizens for lawful purposes." In short, we proceed on the assumption that these laws ban

weapons protected by the Second Amendment." See *NYRA v. Cuomo* at p. 28. See also *Heller*

*II,* 670 F. 3d 1260-61 quoting *Heller*, 554 US at 625.

45.      In the *NYRA v. Cuomo* case, after determining that the SAFE ACT bans

weapons protected by the Second Amendment, the Court moved on to the second step of the

inquiry which is the means-end test. When the Second Circuit court employed the means-end

test it was only then that the Court found the SAFE ACT was constitutional.

Under *Bruen*, the Court held that the means/end analysis is one step too many.

Accordingly, when analyzing the rationale in the *NYRA v. Cuomo* decision, it is clear that if the

*Bruen* one-step test is applied to the *NYRA v. Cuomo* decision, the SAFE ACT is

unconstitutional because the Second Circuit already determined that the the SAFE ACT passed

step one of the *Bruen* analysis. Thus, *NYRA v. Cuom*o decision clearly illustrates that the only

reason the SAFE ACT was found constitutional was based upon the means-end test. If

this court removes the means-end test from the *Cuomo* decision the SAFE ACT is

unconstitutional.

46.      Nonetheless, if this Court does not agree with the foregoing analysis, then

it is the burden of the Defendants to prove that there are specific colonial and Civil War/

antebellum statutes passed centuries ago that justify the constitutionality of the SAFE ACT.

<u>**Historical Statutes of the Colonial Era**</u>

47.     Interestingly, in the *Bruen* decision, Judge Thomas, as if pre-empting arguments that would be made in other Second Amendment cases, specifically addresses each of the government and amici examples of historical regulations on firearms that support the constitutionality of the firearm regulation in the *Bruen* case. Although the *Bruen* case involved handgun regulation, Judge Thomas' analysis of the government's history/text arguments is directly applicable to the instant case.

48.     In the colonial and civil war era, there were obviously no modern day handguns and rifles to regulate. At the time of the enactment of the Second and Fourteenth Amendment's there were very few, if any semi-automatic firearms in existence. However, the Supreme Court specifically addresses how the Courts should address that issue.  In *Heller* the Supreme Court held that there were statutes in the colonial era that prohibited bearing arms in a way that spread "fear" or "terror" among the people, including by carrying of "dangerous and unusual weapons." See *Heller* at 627.

49.     These examples of colonial era prohibitions of firearms that spread fear or terror or are "dangerous and unusual" are analogous to the legislative intent behind the passing of the SAFE ACT.  The SAFE ACT,  was passed on January 15, 2013 after the Sandy Hook massacre because the New York State legislature decided that the gun used in that shooting was a rifle that had military style features that made it more dangerous than a basic semi-automatic rifle and therefore should be banned completely. See the Second Circuit court's

analysis in *NYRA V. Cuomo* at 245. Thus, the legislature's reasoning in banning semi-automatic rifles that had one military style feature was based upon similar reasons as the prohibitions on guns during the colonial era that caused terror to the people and were dangerous and unusual.

50.     Judge Thomas addressed this exact issue in *Bruen* by stating that these colonial statutes would not be applicable to weapons in "common use" because obviously weapons in common use would not be "unusual". Judge Thomas stated that these laws "show that colonial legislatures *sometimes* prohibited the carrying of "dangerous and unusual weapons" and further that "the Second Amendment protects only the carrying of weapons that are those "in common use at the time" as opposed to those that are highly unusual in society at large." *Bruen* at 38.

51.     *Heller* and *Bruen* settled the common use issue by holding that assault rifles like AR-15s, and other similar rifles (which have one or more military style features) are in common use in the United States since tens of millions of people possess them and are the second most popular guns in America behind the handgun.  Further, since *Heller* and *Bruen* held that the AR-15 and other similar sporting rifles are "*typically possessed by law-abiding citizens for lawful purposes*" they cannot be said to be "*dangerous and unusual*".

52.     In *Heller* the Court described the historical limits on the Second Amendment right that are "presumptively lawful." Historically,  "states may prohibit "possession of firearms by felons and the mentally ill, [possession] of firearms in sensitive places such as

schools and government buildings, [and may impose] conditions and qualifications on the

commercial sale of arms." *Heller,* 554 U.S. at 626-27.

53.    None of the above presumptively lawful historical restrictions on firearms has

any relevance to the SAFE ACT's prohibition of "assault weapons" and is therefore not

applicable to his case. Clearly the SAFE ACT does not relate to possession by felons or the

mentally ill, possession of assault weapons in sensitive places nor does it restrict commercial

sale of arms.  If the Defendants cannot meet the burden of proving similar historical precedent

in the United States for the statutory restrictions of the SAFE ACT, then the Safe Act must be

held unconstitutional under the *Bruen*.

## ABSTENTION DOCTRINE

*54.*    *Plaintiff*  is aware that *Younger v. Harris* 401 v. U.S. 37 (1971) and its

companion cases provides that under the Abstention Doctrine the federal courts will

refrain from interfering with state court proceedings under principals of comity.  However

there are exceptions to the rule. The *Younger* Court did not rule out the possibility that

there could exist extraordinary circumstances in the absence of bad faith and harassment

which would justify intervention. "It is of course conceivable that a statute might be

flagrantly and patently violative of express constitutional prohibitions in every clause,

sentence and paragraph, and in whatever manner and against whomever an effort might be

made to apply it." *Younger v. Harris*, 401 v. U.S. at 53.

55.    Plaintiff submits that Harvey's case involves extraordinary circumstances

of serious irreparable harm in the form of years of incarceration based upon a statute that

is now clearly unconstitutional under the *Bruen* decision.  The District Attorney in its

opposition to Harvey's motion to dismiss failed to cite one example of historical

analogous statutory precedent to support the SAFE ACT's ban on the types of rifles

Harvey possessed.  See **Exhibit C.**  There is no historical precedent in the law from the

years surrounding the enactment of the Second Amendment (1789) that will support a

total ban on essentially a semi-automatic rifle with one cosmetic feature that makes the

rifle look menacing or similar to a military rifle (which it certainly is not).  Plaintiff

submits the defendants know that under *Bruen* there is no colorable legal argument to

support the constitutionality of the SAFE ACT and are moving forward with the

prosecution of Harvey regardless. If there is precedent in the nation's history for this sort

of rifle ban the defendants' should be asked by this Court to provide the examples from

our nation's history to support the SAFE ACT. If the Defendants cannot provide the

precedent it would be clear that the continued prosecution of Harvey is not in good faith

and the likelihood of irreparable harm to Harvey is convicted is too great to permit it to

continue.  If this Court does not find that the SAFE ACT is unconstitutional then it is very

likely that Harvey will be prosecuted, convicted and sentenced to years in prison and his

only recourse at that point will be to file an appeal the judgment of conviction and perhaps

serve substantial prison time before a Court either in the New York State or in this District

or Circuit finds the SAFE ACT unconstitutional.  This would be draconian, unfair and

inequitable.

### *FIRST CAUSE OF ACTION*

**42 U.S.C. § 1983 Action for Deprivation of Plaintiffs' Rights under the Second and Fourteenth Amendments of the United States Constitution**

56.     Plaintiff reiterates the foregoing paragraphs as if fully set forth herein. There is an actual and present controversy between the parties.

57.     To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must allege (1) that some person has deprived him of a federal right, and (2) that the person who has deprived him of that right acted under color of state law." *Velez v. Levy*, 401 F.3d 75, 84 (2d Cir. 2005).

58.     The Second and Fourteenth Amendments to the United States Constitution guarantee ordinary, law-abiding citizens of states their fundamental right to keep and bear arms, both in the home and in public.

59.     The keeping and bearing of arms is a fundamental right that is necessary to our system of ordered liberty, and is additionally a privilege and immunity of citizenship, protected by the Fourteenth Amendment.

60.     The right to keep and bear arms includes, but is not limited to, the right of individuals to acquire, purchase, receive, transport, possess, and lawfully use common firearms for all lawful purposes, including self-defense.

61.     New York' bans firearms that are commonly used for lawful purposes, grounding this ban on an arbitrary combination of features that do not make a firearm more powerful or

dangerous.      No adequate basis exists to restrict such firearms, which fire only once per trigger

pull, like all other semiautomatic firearms.

62.     42 U.S.C. § 1983 creates a cause of action against state actors who deprive

individuals of federal constitutional rights under color of state law.  Defendants, individually and

collectively and under color of state law at all relevant times, have deprived the fundamental

constitutional rights of persons in New York, including Plaintiff Harvey through enforcement of

the total ban on "assault weapons" codified in the SAFE ACT and Penal Law § 265.02(7) and

New York Penal Law § 265.00(22).

63.     For all the reasons asserted herein, Defendants have acted in violation of, and

continue to act in violation of, 42 U.S.C. § 1983, compelling the relief Plaintiffs seek.


**PRAYER FOR RELIEF**


WHEREFORE, Plaintiffs respectfully pray for the following relief:

(a) A declaratory judgment that Plaintiff Keith Harvey has a fundamental right to keep

and bear arms, including by possessing, acquiring, purchasing, receiving, transporting, and

lawfully using common semiautomatic firearms banned in New York for all lawful purposes

including self-defense, as guaranteed under the Second and Fourteenth Amendments to the

United States Constitution;

(b) A declaratory judgment that New York's ban on common semiautomatic firearms,

including N.Y. Penal Law §§ 265.00(22)(a)-(f); 265.02(7), 265.10, 70.02 and all related

regulations, policies, and/or customs designed to enforce or implement the same, prevent

Plaintiff Harvey from exercising his fundamental right to keep and bear arms, including by

acquiring, purchasing, receiving, transporting, possessing, and lawfully using common

semiautomatic firearms banned under New York law for all lawful purposes including self-

defense, as guaranteed under the Second and Fourteenth Amendments to the United States

Constitution;

Plaintiff's costs and disbursements related to this matter;

Any and all other and further legal and equitable relief against Defendants as necessary to

effectuate the Court's judgment, or as the Court otherwise deems just and proper.

Dated: January 17, 2023

*/s/ Edward J. Muccini*

_____
Edward J. Muccini Esq. (EM8455)
Law Office of Edward J. Muccini P.C.
242-03 Northern Blvd
Douglaston, New York 11362
(718) 225-0205
Fax: (718) 225-0213
Edwardmuccini@Gmail.com